**Marvin WOLF, in his individual capacity and as general agent on behalf of Woodstock East Associates, a limited partnership aka Woodstock East Associates, Plaintiff,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Defendant.**

No. 2:94–cv–70.

United States District Court, D. Vermont.

Oct. 2, 1996.

Robert E. Manchester, Manchester Law Offices, P.C., Burlington, VT, for Marvin Wolf, in his individual capacity and as general agent on behalf of Woodstock East Associates, a limited partnership aka Woodstock East Associates.

Samuel Hoar, Jr., Dinse, Erdmann, Knapp & McAndrew, Burlington, VT, Walter J. Andrews, Christine Connelly, Paul E. Janaskie, Wiley, Rein & Fielding, Washington, DC, for U.S. Fidelity and Guaranty Company.

1. The complete text of the release agreement states:

**POLICY RELEASE**

In consideration of payment to me by United States Fidelity and Guaranty Company in the amount of $2,161.41 Dollars, in full settlement of claim for personal injuries (including sickness) and or property damage that has been

## OPINION AND ORDER

SESSIONS, District Judge.

This is a declaratory judgment action in which Plaintiff Marvin Wolf ("Wolf"), on behalf of himself and Woodstock East Associates ("WEA"), seeks a declaration that the insurer of an insolvent contractor, Defendant United States Fidelity & Guaranty Company ("USF & G"), is obligated to satisfy a judgment obtained by them against its insured, Woodstock Structures, Inc. ("WSI"). This matter comes before the Court on USF & G's objections to the Magistrate Judge's Report and Recommendation that this Court deny its motion for summary judgment.

### Background

In November 1973, a leak was discovered in a gasoline storage tank and/or related piping on the Woodstock East property in Woodstock, Vermont. The storage tank had been installed by contractor WSI in 1972 for the owner of the property, Gerrish Corporation ("Gerrish").

WSI was insured by USF & G under comprehensive general liability policy no. 1CC677846 for the period from June 1, 1973 to June 1, 1974. WSI filed a claim with USF & G in connection with the leak. USF & G and WSI settled the claim, and on April 17, 1974, WSI agreed to release and hold harmless USF & G for "any loss or damage hereinafter arising out of [the] accident ... or its results" in exchange for payment of $2,161.41.[1]

Marvin Wolf, as general partner and on behalf of WEA, a Vermont limited partnership, leased the Woodstock East property from Gerrish for a 5-year term, with an option to purchase, beginning in May, 1984. In May, 1985, the State of Vermont through its Agency of Environmental Conservation

asserted by or against me (us) as an insured under policy No. 1CC677846 by reason of an accident that occurred on or about 11/19/73, I/we hereby release and hold harmless the United States Fidelity and Guaranty Company for any loss or damage hereinafter incurred arising out of said accident or sickness or its results.

informed Wolf that the Woodstock East property was the source of petroleum pollution which was entering the Ottauquechee River, and that Wolf was a "potentially responsible party" under 10 V.S.A. § 1283 (1984).

In May 1991, Wolf and WEA brought suit against WSI in Windsor County Superior Court, seeking damages for diminution of property value, lost rents and profit, and the costs of cleanup. On March 31, 1993, Wolf and WEA obtained a default judgment against WSI in the amount of $630,488 plus interest and costs. Believing WSI to be insolvent, Wolf initiated suit in this Court demanding that USF & G satisfy the default judgment. Shortly thereafter USF & G moved for summary judgment on the grounds that the release agreement relieved it of any obligation to satisfy the judgment entered against WSI. The case was referred to United States Magistrate Judge Niedermeier pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) (1993).

The Magistrate Judge recommended that USF & G's motion for summary judgment be denied. He reasoned that Vermont courts would adopt the rule that a release is not valid against third parties if liability has already attached. He then determined that liability had attached when the gas leaked, in 1973. He concluded that because liability had attached before the release was signed, the release agreement was invalid against Wolf and WEA. Magistrate Judge's Report and Recommendation, Sept. 27, 1995 ("Recommendation").

USF & G objected to the Recommendation, arguing against this result on case law and public policy grounds, as well as asserting that the release agreement was executed long before liability attached to WSI or USF & G as to this claim.

This Court must make a de novo determination of those portions of the report or recommendation to which objection is made. It may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). After careful review of the file, the Magistrate Judge's Report and Recommendation, the objections,

and response to objections, the Court accepts the recommendation that Defendant's Motion for Summary Judgment be denied, but for the reasons stated below.

## Discussion

Summary judgment should be rendered for a moving party if the court finds that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact. Id. at 325, 106 S.Ct. at 2553. All justifiable inferences are to be drawn in favor of the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–9, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

The material facts concerning the discovery of the gasoline leak, the execution of the "policy release," the State of Vermont's notice to Wolf more than a decade later of his potential responsibility for the petroleum pollution, and the subsequent default judgment obtained by Wolf against WSI are not in dispute. At issue is whether the release agreement between WSI and USF & G relieves USF & G of any obligation to satisfy the judgment entered against WSI.

The parties do not dispute that Vermont law governs this action.

## I. Validity of Release Agreement

USF & G has argued that the plain language of the release agreement relieves it of any obligation to satisfy the judgment entered against WSI. Wolf has responded that the plain language of the release does not address the rights of third party claimants, that the Court should therefore consider the circumstances surrounding the making of the agreement, and that the policy release should be unenforceable against third party judgment creditors.

■ Under Vermont law, "a release is a contract, and its scope is determined by the 'intention of the parties as expressed in the terms of a particular instrument considered in the light of all the facts and circumstances.'" *Leo v. Hillman,* 164 Vt. 94, 665 A.2d 572, 579 (1995) (quoting *Economou v. Economou,* 136 Vt. 611, 619, 399 A.2d 496, 500 (1979)). Intention is determined by considering what was within the contemplation of the parties when the release was executed. *Economou,* 136 Vt. at 619, 399 A.2d 496.

To ascertain the intent of the parties, therefore, it is necessary first to examine the terms of the policy release itself. If the language is clear and unambiguous, the plain meaning of the language applies. *In re New England Telephone and Telegraph Co.,* 159 Vt. 459, 466, 621 A.2d 232, 237 (1993) (quoting *Isbrandtsen v. North Branch Corp.,* 150 Vt. 575, 577, 556 A.2d 81, 83 (1988)).

■ The policy release does not specifically refer to unknown potential claims of injured third parties. In general terms, this apparently standard form purports to release USF & G for "any loss or damage hereinafter incurred arising out of said accident . . . or its results," in exchange for a payment of $2,161.41 "in full settlement of claim for . . . property damage that has been asserted by or against me (us)".

The language of the policy release is open to at least two logical interpretations: one, urged by USF & G, is that the insurer was thereby released from obligation for any loss or damage incurred after the release was executed in 1974, no matter by whom. The second interpretation, taking into consideration the full language of the document, suggests that the insured was merely agreeing to settle its claim against the insurer and promising not to seek any additional reimbursement for loss or damage it might incur in connection with the claim already asserted.

The first interpretation would bar Wolf's claim, because he concedes that he did not incur loss or damage until 1985, when he received notice of the State of Vermont's claim for pollution remediation. Plaintiffs' Memorandum in Support of their Cross–Motion for Summary Judgment (paper 32) at 7. The second interpretation of the document would not bar third party claims such as the one asserted here.

The language of the policy release thus does not supply any clear manifestation of the parties' intent. "Ambiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." *Isbrandtsen,* 150 Vt. at 579, 556 A.2d 81. *See also Learned v. Bellows,* 8 Vt. 79, 84 (1836) (courts examine the circumstances surrounding the execution of a general release in order to determine the intention of the parties).

From the face of the document alone, a conclusion that WSI intended merely to secure payment for its own cleanup costs is at least as reasonable as a conclusion that WSI intended to relieve USF & G of all responsibility. The former conclusion gains added weight given the small amount of consideration received for the release in comparison with the sums at stake in the subsequent litigations. Moreover, the failure to include language in the release explicitly relieving USF & G of responsibility for third party claims or future pollution remediation claims, and the apparent lack of information or notice on the subject of potential future claims given to WSI at the time the release was executed, likewise militate against the interpretation of the release urged by USF & G.

At this stage of the proceedings, however, genuine issues of material fact exist concerning what was intended by the parties and what was within their contemplation at the time the release was executed, precluding summary judgment. *See Bank of America Nat. Trust & Sav. v. Gillaizeau,* 766 F.2d 709 (2d Cir.1985) (existence of ambiguity in release mandates factfinding on the question of intent, under New York law).

Brent Wood, who handled the WSI claim for USF & G, testified that USF & G knew that some 5,000 gallons of gasoline had escaped underground before the leak was discovered; that if the gasoline entered a waterway the State of Vermont might seek penalties from responsible parties; that the release was a standard form; that other than a claim from Gerrish for the lost gas he had no knowledge of any other potential claims

**70**

arising out of the gas leak. *Gerrish Corp. v. Universal Underwriters Ins. Co.*, Trial Tr. v. I at 27, 28 (att. 8 to paper 33); 6/27/95 Dep. at 68, 73–74 (att. 12 to paper 33).

Kenneth Baker, a corporate officer of and project manager for WSI, testified that Gerrish claimed a loss of approximately 5,000 gallons of gasoline; because the gasoline did not appear to be polluting any wells or waterways at the time, the state of Vermont was not concerned about the leak; that he did not discuss the implications of the policy release nor did he consider that he might be giving up any rights to indemnification for future third party claims by signing it; that if it had been explained to him that way he would not have signed it. 6/28/95 Dep. at 51, 54, 64, 66–67 (att. 13 to paper 33).

This testimony establishes that there are genuine issues of fact as to whether USF & G and WSI intended the release to cover third party injuries unknown at the time it was signed, where neither USF & G nor WSI could have known of Wolf's injury at the time, they did not discuss the release's applicability to third party claims or to claims for pollution remediation, the consideration received was approximately the amount WSI expended in repairs to the storage system, and the only evidence that the parties intended to release claims for unknown injuries was the language of the release itself. It also raises the question whether the release was executed fairly and knowingly, given the possibility that the signing parties had inaccurate knowledge concerning the future consequences of the gasoline leak.

Because the Court finds that there are issues of fact precluding summary judgment concerning the parties' intent in executing the release, it is not necessary at this time to address generally the issue of when liability attaches in cases involving exposure to toxic substances, which was presented in the Magistrate Judge's Report and Recommendation.

*Conclusion*

The Defendant's motion for summary judgment (paper 14) is Denied.